964 F.2d 865
 Gail LIGHTFOOT; Steve Alexander; Pat McHargue; Eric
Garris; Ann Justi; George O'Brien; Wayne
Nygren; Ronald Rubidoux; and
Libertarian Party of
California,
Plaintiffs-
Appellants,
v.
March Fong EU, Secretary of State of California, Defendant-Appellee.
 No. 90-16680.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 11, 1992.
Decided May 18, 1992.
As Amended July 6, 1992.
 
 Arlo Hale Smith, San Francisco, Cal., for plaintiff-appellant.
 Thomas P. Reilly, Deputy Atty. Gen., Oakland, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before: HALL and WIGGINS, Circuit Judges and BURNS, District Judge.*
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 The Libertarian Party of California ("the Party"), its Chairman Gail Lightfoot, and several of its members sought an injunction ordering Secretary of State March Fong Eu to place Pat McHargue, George O'Brien, Ronald Rubidoux, and Eric Garris on the ballot for the November 1990 California general election as the Libertarian candidates for various state and federal offices. They also sought a declaratory judgment that California Elections Code sections 6653 and 6661(a) are unconstitutional under the First and Fourteenth Amendments to the United States Constitution. The district court denied the Party's motion for summary judgment and granted the State's motion to dismiss or, in the alternative, for summary judgment.
 
 
 2
 The Party appeals the district court's order. It argues that section 6653, which requires political parties to nominate candidates by direct primary, and section 6661(a), which requires candidates to demonstrate a modicum of support among the electorate before they may appear on the general ballot, violate the Party's freedom of association. The 1990 election having receded into history, we obviously cannot enjoin the state from denying the Libertarian candidates a place on the 1990 ballot. The only issue before us, therefore, is whether the district court properly denied the Party's request for declaratory relief.
 
 
 3
 * BACKGROUND
 
 
 4
 California Elections Code section 6610 provides: "The person who receives the highest number of votes at a primary election as the candidate of a political party for nomination to an office is the nominee of that party at the ensuing general election." Cal.Elec.Code § 6610 (West 1977). A candidate is eligible to run in the primary if he or she complies with certain formalities. See id. §§ 6490 et seq. A candidate who does not comply with these formalities, but whose name has been written in on the primary ballot and who receives more votes than any other candidate for the party's nomination, will be eligible to represent the party on the general ballot if he or she satisfies one of three prerequisites. The first of these is a requirement that the number of votes the candidate receives in the primary is "equal in number to 1 percent of all votes cast for the office at the last preceding general election at which the office was filled." Cal.Elec.Code § 6661(a) (West Supp.1992).
 
 
 5
 In February 1980, the Libertarian Party, apparently unhappy with this rule, chose to adopt its own requirements for nominating a write-in to represent it on the general ballot. Libertarian Party Bylaw 15 permits the Party to nominate a write-in if: a) he or she receives more votes than anyone else for the party's nomination for that office; and b) the number of votes he or she receives in the primary is "equal to the number of signatures that he or she would have needed in order to have qualified to appear on the Party's primary ballot per California Elections Code section 6495."[1] Bylaw 15 purports to "supersede California Election Code section 6661(a)."
 
 
 6
 If a party fails to nominate a candidate through the primary process, it may not fill the resulting vacancy on the general ballot by other means, such as a nominating convention. California Elections Code § 6653 provides: "No vacancy on the ballot for a general election may be filled except if the candidate dies and that fact has been ascertained by the officer charged with the duty of printing the ballots at least 68 days before the next ensuing general election." Id. § 6653. Just as the Party adopted its own nominating qualifications for write-ins, the Party adopted its own process for nominating candidates, also in contravention of State law. Libertarian Party Bylaw 17 states that party nominations may be made either by primary election or by party convention.
 
 
 7
 In June 1990, California held a primary election. Apparently no one competed in the Libertarian primary for the offices of United States Congressman for the 10th Congressional District, State Treasurer, and State Assemblyman for the 18th Assembly District. Consequently, there were vacancies for these positions on the general ballot, which the Party sought to fill via a post-primary nominating convention. The Party nominated Pat McHargue, George O'Brien, and Ronald Rubidoux as its respective candidates for those offices, pursuant to Bylaw 17. Because this procedure violated section 6653, Secretary Eu refused to place the candidates on the general election ballot.
 
 
 8
 Eric Garris ran in the Republican primary and was nominated as the Republican candidate for the 21st Assembly district. He appeared on the general election ballot as the Republican candidate for that office. Garris also wished to be the Libertarian candidate for the office, but under California Election Code § 6401, he was not permitted to run in both primaries. See id. § 6401. Therefore, his only opportunity to be listed as the Libertarian party candidate on the general ballot was to qualify as a write-in. Unfortunately for the Party, though Garris polled more votes in the Libertarian primary than any other candidate, he failed to meet the 1% threshold and consequently Secretary Eu refused to identify him on the general ballot as the Libertarian Party candidate.
 
 
 9
 The Party sought injunctions to place McHargue, O'Brien, Rubidoux, and Garris on the ballot and declaratory judgments that sections 6661(a) and 6653 violate the Party's First Amendment right to freedom of association. The district court dismissed the case and, in the alternative, granted summary judgment to the State.
 
 II
 DISCUSSION
 
 10
 Both parties take quite different approaches to analyzing the issues presented by this case. The Party argues that the case is "not a classic ballot access" case because as a "qualified party" under California law, it already has access to the ballot. Rather, the Party maintains, the case "involves a conflict between party rules and state law with respect to the procedures by which the Libertarian Party makes its nominations for the general election ballot." The State, on the other hand, argues that this is very much a ballot access case, albeit a slightly unconventional one. Each party is half right.
 
 
 11
 The Party complains that section 6661(a) denied it the opportunity to nominate a write-in candidate for State Assembly in this election because there was no assembly voting district in which there was a sufficient number of Libertarian voters to enable a Libertarian write-in to meet the 1% threshold. No matter how the Party characterizes its objection to section 6661(a), if that law infringes on freedom of association at all, it is because it denies the Party access to the ballot. It does not infringe on the Party's right to "adopt its own procedures for self-governance" because it does not purport to regulate intraparty procedures. And to say that the law infringes on the Party's ability to "nominate the standard bearers of [its] choice" is no different from saying that the law blocks access to the ballot for the Party's chosen candidate.
 
 
 12
 Section 6653, on the other hand, does not impede the Party's access to the ballot. To be sure, it denies access to political parties that fail to hold primaries. The real burden of the law, however, is that it usurps political parties' power to determine for themselves the process by which they will take advantage of the access they are afforded; that is, the process by which they will nominate their candidates.
 
 
 13
 * We must first resolve the parties' dispute over the degree of scrutiny to which these laws should be subject. The Supreme Court's approach to election law cases has been to consider the extent to which the law in question infringes on a minor party's freedom of association and to balance that infringement against the state's alleged interest in the rule. See Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1982); Erum v. Cayetano, 881 F.2d 689, 692 (9th Cir.1989). The Party contends that this is a strict scrutiny test requiring the State to demonstrate that the law is narrowly tailored to serve a compelling interest. In Erum, however, we concluded that although the Supreme Court has from time to time purported to employ strict scrutiny in these cases, "heightened scrutiny is not the rule and two of the Court's most recent cases seem to have abandoned that pretense altogether in favor of pure balancing." Erum, 881 F.2d at 692 n. 7.
 
 
 14
 At the time Erum was decided, the Court's decisions regarding voting rights were in tension with each other on the question of scrutiny. Compare Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989) (election laws that burden First Amendment rights must serve a "compelling state interest" and be "narrowly tailored to serve that interest") and id. at 233-34, 109 S.Ct. at 1026 (Stevens, J., concurring) (expressing discomfort with the Court's use of such tests) with Munro v. Socialist Workers Party, 479 U.S. 189, 193-94, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986) (failing to articulate a standard of review) and id. at 201, 107 S.Ct. at 540 (Marshall, J. dissenting) (noting this failure, describing it as a departure from the Court's prior ballot access cases employing strict scrutiny, and advocating continued adherence to that test).
 
 
 15
 The Court resolved its ambivalence about this matter in Norman v. Reed, --- U.S. ---- 112 S.Ct. 698, 116 L.Ed.2d 711 (1992), its most recent ballot-access case, which clearly held that any law impinging on a political party's access to the ballot will be subject to strict scrutiny. In Norman, the Court considered whether two Illinois Election laws, as construed by the Illinois Supreme Court, violated the Harold Washington Party's right to access the ballot. The Court set the terms of its review in the unmistakable language of strict scrutiny:
 
 
 16
 To the degree that a State would thwart this interest by limiting the access of new parties to the ballot, we have called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation, and we have accordingly required any severe restriction to be narrowly drawn to advance a state interest of compelling importance.
 
 
 17
 Id. at 705 (citation omitted) (emphasis added).
 
 
 18
 We conclude, therefore, that Erum's holding that strict scrutiny does not apply in ballot-access cases has been overruled by Norman.[2] It bears emphasizing, however, that unlike other areas in which strict scrutiny has been employed, its invocation in election law cases has not preordained their outcome. In fact, the Court has repeatedly stressed that there is no "litmus-paper test" for evaluating constitutional challenges to ballot-access restrictions. See Socialist Workers Party, 479 U.S. at 193, 107 S.Ct. at 536 (quoting Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)). With this admonition as our guide, we consider the constitutionality of California Election Code sections 6661(a) and 6653. We review a district court's grants of summary judgment de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989).
 
 B
 
 19
 The Party claims section 6661(a) seriously infringes on its ability to field candidates of its choice in general elections. Eric Garris ran in the 1990 Republican primary, won, and was listed on the general ballot as the Republican candidate for State Assembly in the 21st Assembly District. Garris was a write-in candidate in the Libertarian primary and polled more votes than any other candidate. But Garris was unable to qualify as the Libertarian candidate on the general ballot because he did not meet the 1% threshold. Moreover, in May 1990, there was no State Assembly District in California containing a sufficient number of Libertarian voters to enable any Libertarian write-in candidate to meet the 1% threshold, even if he or she were to have obtained every single Libertarian vote in his or her district. We note that the Party's challenge to section 6661(a) arises in a somewhat unusual context because Garris did appear on the general ballot, albeit as the Republican candidate. Even though Garris was on the ballot, the Party complains that section 6661(a) infringed on its freedom to associate with him because it prevented Garris from being designated Libertarian.
 
 
 20
 Vote thresholds like that prescribed by section 6661(a) are quite common and have been reviewed on several occasions by the Supreme Court and the Ninth Circuit. Socialist Workers Party, one of the Court's most recent ballot-access cases, considered the effect on minor parties of a threshold similar to that of section 6661(a), and concluded that it did not violate the parties' freedom of association. The State of Washington would not include on the general election ballot any minor-party candidate who failed to receive at least 1% of all votes cast for that office in the primary. In a primary election held in 1983, the person who received the largest number of votes in the Socialist Workers Party primary fell just short of meeting the 1% threshold and thus did not qualify for the general election ballot.
 
 
 21
 The Court began its analysis of the Washington law from the premise that "States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." 479 U.S. at 193, 107 S.Ct. at 536. It emphasized that Washington's restrictions actually placed a lighter burden on minor parties than those the Court had upheld in Jenness v. Forston, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) and American Party of Tex. v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). The restrictions at issue in those cases prevented a minor party from obtaining access to any ballot if it did not demonstrate the requisite voter support. Washington's law, on the other hand, burdened only access to the general election ballot, while affording minor-party candidates "easy access to the primary election ballot and the opportunity for the candidate to wage a ballot-connected campaign." Socialist Workers Party, 479 U.S. at 199, 107 S.Ct. at 539. Thus, the Court concluded, any burden the law placed on minor parties' First Amendment rights was "slight." Id.
 
 
 22
 Minor-party candidates in California have even greater access to the ballot than those in Washington. Like Washington, California provides easy access to the primary ballot. A candidate for State Assembly may run in a qualified minor party's primary simply by obtaining 40 signatures in support of his or her candidacy. Cal.Elec.Code § 6495(b) (West Supp.1992). Unlike Washington, however, California places no additional obstacles between those candidates and the general election ballot except, of course, a requirement that they win their party's primary. Those who do are automatically placed on the general election ballot no matter how few votes they receive. Only write-in candidates must satisfy the 1% threshold. California law, therefore, offers even greater access to the ballot than did the Washington law upheld in Socialist Workers Party. See 479 U.S. at 191, 107 S.Ct. at 535.
 
 
 23
 Despite the Party's claim to the contrary, it is not significant that it was impossible for any Libertarian write-in candidate to meet the 1% threshold in the 1988 primary. In Socialist Workers Party, the Party argued that the total pool of primary voters was so small that it would be quite difficult for it to meet the 1% threshold. The Court rejected this argument on the ground that voter apathy was not an impediment created by the State of Washington. See id. at 198, 107 S.Ct. at 539. Likewise, the small number of voters eligible to vote in the Libertarian primary is not an impediment created by the State of California. The Libertarian Party could broaden the number of voters that participate in its primary by opening its currently closed primary to non-Libertarians, and the State could not prevent it from doing so. See Tashjian v. Republican Party of Conn., 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (holding that state law requiring that voters in party primary be registered members of the party violates First Amendment right to freedom of association). If, as the Party contends, it is unwilling to open its primary, it may broaden its voter base by increasing its membership. If it is unable to do so because its message is not attractive to a large number of voters, that is not the fault of the State. We conclude that, as a general matter, the burden section 6661(a) places on the Party's access to the ballot for the candidate of its choice is slight.
 
 
 24
 But the Party contends that section 6661(a) imposes a unique burden in this case because the Party wanted to nominate a candidate who ran in another party's primary. Because Garris ran in the Republican primary, he could not run in the Libertarian primary. Therefore, his only opportunity to be listed as the Libertarian party candidate on the general ballot was to qualify as a write-in. The Party has not challenged the State's prohibition on cross-filing. It challenges only the way section 6661(a) operates to prevent it from listing Garris as the Libertarian candidate on the general election ballot.
 
 
 25
 The Libertarian Party presented essentially the same argument to the California Supreme Court over a decade ago, before it was a qualified party in California. In Libertarian Party of Cal. v. Eu, 28 Cal.3d 535, 170 Cal.Rptr. 25, 620 P.2d 612 (1980), the Supreme Court considered whether the Party had a First Amendment right to have two independent candidates designated as Libertarian candidates on the general election ballot. The two candidates qualified to appear on the ballot as "Independent" candidates, but because the Libertarian Party was not a "qualified party" under California law, the Secretary refused to designate the candidates as "Libertarian." The court found that California Election Code section 10210, which required candidates who qualified "by virtue of an independent nomination" to be designated as "Independent," rather than as a member of a political party, did not violate the Party's freedom of association. Id. at 618. It concluded, correctly, that the Party was "in no way restricted in its associational activities or in its publication of the affiliation of its candidates." Id. at 617.
 
 
 26
 The ascension of the Libertarian Party of California to political legitimacy does not render the reasoning of the California Supreme Court any less persuasive than it was ten years ago. Because Garris was on the general ballot, the Party was free to associate with him in every way that counts. The Party was free to publicly endorse Garris and Party members were free to vote for him. Therefore, the burden placed on the Party's associational rights by the proscription against designating its affiliation with Garris on the ballot was slight.
 
 
 27
 Though we conclude that the burden section 6661(a) places on the Party's associational rights is slight, we must nevertheless evaluate the significance of the State's interest. The State suggests that its interest in requiring the 1% threshold is to ensure that any candidate appearing on the general ballot has demonstrated a "modicum of support." In Jenness, the Supreme Court first recognized that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot--the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." 403 U.S. at 442, 91 S.Ct. at 1976. The court has reaffirmed that principle on several occasions, most recently in Socialist Workers Party. See 479 U.S. at 194, 107 S.Ct. at 537.
 
 
 28
 The State's interest in requiring that a candidate demonstrate a modicum of support is significant enough to justify not only refusing to place a candidate on the ballot, but also refusing to designate a candidate on the ballot as Libertarian. In the latter case, the 1% threshold serves to avoid voter confusion by requiring that a candidate have sufficient support from within a party before his or her name will be associated with that party on the ballot. It is true that even if Garris had received 100% of the Libertarian vote in that primary, he could not have appeared on the ballot as the Libertarian candidate. But without the 1% threshold, the State would have to designate Garris as the Libertarian candidate even if he had obtained but one write-in vote, so long as no other candidate received more than one vote. In such a circumstance, designating Garris as the candidate of the Libertarian Party would be likely to mislead voters about the degree of Libertarian support Garris enjoyed.
 
 
 29
 Because the burden imposed by section 6661(a) on the Party's freedom of association is slight, and because the State has a compelling interest in minimizing voter confusion, we hold that section 6661(a) does not violate the Party's First Amendment right to associate with whomever it chooses. The Party's assertion that "legislative restrictions on the right of a ballot-qualified political party to adopt its own procedures for self-governance including nomination of candidates constitute a substantial impairment of the rights of the party and its members to freedom of association" does find some support in the Supreme Court's jurisprudence, but the Party overstates the breadth of the holdings on which it relies. See San Francisco County Democratic Cent. Comm., 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (holding that California election laws forbidding political parties from endorsing candidates in party primaries and dictating organization and composition of party governing bodies violate right to freedom of association); Republican Party of Conn., 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (holding that state law requiring that voters in party primary be registered members of the party violates right to freedom of association); Democratic Party of U.S. v. Wisconsin, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981) (holding that Wisconsin could hold an open Democratic primary but could not require the National Party to accept the results of that primary, which conflicted with a National Party rule requiring closed primaries). These cases struck down particularly egregious intrusions into party self-governance. Jenness, American Party, and Socialist Workers Party are on all fours with this case and demonstrate that political parties' rights to nominate whomever they want, however they want, is not sacred.C
 
 
 30
 For the same reasons that section 6661(a) places only a slight burden on the Party's access to the ballot, section 6653 also burdens that access only minimally. First, section 6653 places no burden on access to the primary ballot; it impedes only access to the general election ballot. See Socialist Workers Party, 479 U.S. at 199, 107 S.Ct. at 539 (law that provides "easy access to primary election ballot and the opportunity for the candidate to wage a ballot-connected campaign" burdens constitutional rights only slightly). Second, whatever burden section 6653 does place on access to the general ballot is negligible. O'Brien could have appeared on the primary ballot had he obtained 65 signatures supporting his candidacy. McHargue and Rubidoux could have appeared had they obtained 40 signatures. See Cal.Elec.Code § 6495 (West Supp.1992). Once these men obtained places on the primary ballot, there was no obstacle preventing the Party from voting them onto the general ballot.
 
 
 31
 But the Party's challenge to section 6653 is less about ballot access than it is about the State's power to regulate the manner in which the Party governs itself; specifically, how it goes about nominating its candidates. The Supreme Court has noted that rules governing a political party's internal affairs "directly implicate the associational rights" of the party and its members. San Francisco County Democratic Cent.Comm., 489 U.S. at 229, 109 S.Ct. at 1023; see also Republican Party of Conn., 479 U.S. at 224, 107 S.Ct. at 554 (political party's "determination ... of the structure which best allows it to pursue its political goals, is protected by the Constitution"). Thus, section 6653, which attempts to directly regulate the internal affairs of the Party, imposes a heavier burden on the Party's freedom of association than does section 6661(a), which burdens the Party's access to the ballot ever so slightly.
 
 
 32
 Though the Court has recognized that rules governing political parties' internal affairs impose a significant burden on those parties, it has suggested that the states' power to regulate the nominating process is beyond dispute. In rejecting an equal protection challenge to a Texas law that required minor parties to nominate candidates by convention and major parties to nominate by primary, the Supreme Court recognized that the law did not infringe on the freedom of association. "It is too plain for argument ... that the State ... may insist that intraparty competition be settled before the general election by primary election or by party convention." American Party of Tex., 415 U.S. at 781, 94 S.Ct. at 1306; see also Republican Party of Conn., 479 U.S. at 237, 107 S.Ct. at 560 (Scalia, J., dissenting) (state is not "bound to honor a party's democratically expressed desire that its candidates henceforth be selected by convention rather than by primary"). While the Court has issued this dictum suggesting that a state categorically has the power to determine the method by which a party nominates a candidate, neither it, nor any federal court that we are aware of, has actually decided the question. We therefore face the issue as one of first impression.
 
 
 33
 The State justifies the direct primary requirement as a Progressive Era reform designed "to take political nominations out of the smoke-filled rooms of party bosses and give them to the voters." The direct primary was one of several measures conceived of by the Progressives to destroy what they viewed as "the corrupt alliance" between wealthy special interests and the political machine. Richard Hofstadter, The Age of Reform 257 (Vintage Books 1955). The Progressives believed democracy should be something greater than competition between political parties. Id. at 263. They viewed the direct primary as a vital weapon in their battle to "make government accessible to the superior disinterestedness and honesty of the average citizen. Then, with the power of the bosses broken or crippled, it would be possible to check the incursions of the interests upon the welfare of the people and realize a cleaner, more efficient government." Id. at 257. We can imagine no government interest more compelling. Though honest people may debate the success of the direct primary in producing the kind of government the Progressives envisioned, it is a means sufficiently tailored to its ends to satisfy the Constitution. Indeed, if the goal of California's Progressive reformers was to deliver power over the political process from the hands of party bosses and special interests into those of the people, no measure short of the direct primary would be adequate. We therefore hold that the State's interest in enhancing the democratic character of the election process overrides whatever interest the Party has in designing its own rules for nominating candidates.[2]
 
 CONCLUSION
 
 34
 The party system has been a prominent and long-standing, if not always exalted, feature of our democracy. Ensuring the freedom of individuals to form political associations with whomever they choose lies at the very heart of the First Amendment. The state must proceed with great caution when it acts in ways that undermine the ability of individuals to form those organizations or deny them the power to run those organizations, once formed, as they choose.
 
 
 35
 But the state is not powerless to act. Turning the entire electoral apparatus over to political parties would pose as great a threat to the integrity of our system of government as would the state's unprincipled meddling in the political process. This recognition informs the Supreme Court's direction to lower courts to strike a balance between the interests of the parties and those of the state that will best enhance the democratic character of our system.
 
 
 36
 We conclude that the balance is best struck by permitting California to require that write-in candidates demonstrate a modicum of support before they will be granted a berth on the general ballot, and that parties nominate candidates by direct primary rather than convention. Therefore, we hold that sections 6653 and 6661(a) of the California Elections Code do not violate the First Amendment right of California political parties to associate with whomever they choose. The judgment of the district court is AFFIRMED.
 
 
 37
 JAMES M. BURNS, Senior District Judge, concurs in the result.
 
 
 
 *
 The Honorable James M. Burns, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 California Elections Code section 6495 requires that a candidate obtain 40 signatures to appear on the primary ballot for election to the United States Congress or State Assembly and 65 signatures to appear on the ballot for election to statewide office. See Cal.Elec.Code § 6495(a) and (b) (West Supp.1992)
 
 
 [2]
 Since this opinion was originally filed, the Supreme Court has further clarified its position on the level of scrutiny it will apply to election laws. It now appears that we were wrong to conclude that Norman stood for the proposition that laws that burden voting rights should always be subject to strict scrutiny and that it consequently overruled Erum. In Burdick v. Takushi, --- U.S. ----, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Court stated that it will evaluate these laws under a "flexible" balancing test, according to which "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." Id. at 2063. If a regulation imposes "severe" restrictions on voting rights, it will be subject to "strict scrutiny." But if the regulation "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the state's important regulatory interests are generally sufficient to justify' the restrictions." Id. at 2063-64 (quoting Anderson, 460 U.S. at 788-89, n.9, 103 S.Ct. at 1569-70, n.9). As we have found that Cal.Elec. Code §§ 6653 and 6661(a) withstand even the most rigorous scrutiny, Burdick has no impact on our holding that these laws are constitutional
 
 
 [2]
 Our holding should not be read to imply that a state could not demonstrate a compelling interest in requiring political parties to nominate candidates via convention. A state might conclude, for instance, that nominating conventions produce more qualified candidates than do primaries and as a consequence produce better government. Since that question is not before us, we express no view on its merits