**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NO LABELS PARTY OF
ARIZONA,

*Plaintiff - Appellee*,

v.

ADRIAN FONTES, in his official
capacity as the Secretary of State of
Arizona,

*Defendant - Appellant*.

No. 24-563

D.C. No.
2:23-cv-02172-JJT

OPINION

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted January 13, 2025
San Francisco, California

Filed July 11, 2025

Before: Holly A. Thomas, Salvador Mendoza, Jr., and
Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Mendoza

# SUMMARY[*]

## Elections / Arizona Law

The panel (1) reversed the district court's grant of a permanent injunction in favor of No Labels Party of Arizona in No Labels's suit alleging that Ariz. Rev. Stat. § 16-311, which requires the Arizona Secretary of State "to accept candidate filings" by eligible persons, burdened its free association rights in violation of the First Amendment; and (2) vacated the permanent injunction.

No Labels confines its electoral pursuits to two positions: Vice President and President of the United States. During the 2024 election, No Labels demanded that the Secretary disregard statements of interest—the precursor paperwork for placement on the primary ballot—filed by five potential down-ballot candidates who were No Labels party members. The Secretary refused.

The panel concluded that No Labels cannot prohibit its party members from participating in the democratic process because Arizona's interest outweighs any burden experienced by No Labels. The Secretary's action, which merely administered state law and allowed eligible No Labels party members placement on the primary ballot, imposed at most a minimal burden on No Labels's associational rights.

Even if the panel were to find that Arizona law imposes a substantial burden on No Labels's rights, the Secretary's

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

mere acceptance of statements of interests by eligible No Labels party members—allowing them to participate in a democratic primary—is narrowly tailored to advance Arizona's compelling interests in (1) ensuring voter and candidate participation in the democratic process; (2) avoiding voter confusion; and (3) limiting opportunities for fraud and corruption.

Because No Labels failed to demonstrate its likelihood of actual success on the merits, the panel held that the district court abused its discretion in issuing an injunction.

## COUNSEL

Andrew G. Pappas (argued), David B. Rosenbaum, Emma J. Cone-Roddy, and Brandon T. Delgado, Osborn Maledon PA, Phoenix, Arizona, for Plaintiff-Appellee.

Kara M. Karlson (argued) and Karen Hartman-Tellez, Senior Litigation Counsel; Kristin K. Mayes, Arizona Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; for Defendant-Appellant.

**OPINION**

MENDOZA, Circuit Judge:

Tensions between the State of Arizona and No Labels Party of Arizona ("No Labels") came to a head in the 2024 general election. The conflict arose from No Labels's limited party purpose. While most parties seek any and all offices to exert influence and meet their policy goals, No Labels confines its electoral pursuits to two positions: Vice President and President of the United States. Arizona law, however, mandates the Arizona Secretary of State (the "Secretary") "to accept candidate filings" by eligible persons. *See* Ariz. Rev. Stat. § 16-311. So, during the 2024 election, when No Labels demanded the Secretary disregard five potential down-ballot candidates' statements of interest, the precursor paperwork for placement on the primary ballot, the Secretary refused.

No Labels contends that Arizona's law burdens its free association rights in violation of the First Amendment because, by requiring the Secretary to accept the statements of interest, Arizona forces the party to pursue offices "it wants nothing to do with." We are presented today with a novel question: Can No Labels prohibit its party members from running for any office, other than for Vice President and President, in its party primary, despite the party members' eligibility under Arizona law? Applying the familiar *Anderson-Burdick* balancing test, we conclude that No Labels cannot prohibit its party members from participating in the democratic process because Arizona's interest outweighs any burden experienced by No Labels. For this reason, we reverse the district court.

**BACKGROUND**

Like other states, Arizona requires new parties to meet certain requirements before attaining recognition and ballot eligibility. Ariz. Rev. Stat. §§ 16-801(A), 16-803, 16-804. A new party must first gather signatures from eligible voters exceeding 1.33% of the total votes cast in the state's prior gubernatorial election and petition the state for recognition. Ariz. Rev. Stat. §§ 16-801(A), 16-803. Once a party achieves recognition, its "candidates are eligible to pursue placement on the primary and general election ballots for the next four years." *Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1089 (9th Cir. 2019) (citing Ariz. Rev. Stat. § 16-801(B)). After four years, a party's recognition expires, and it must either qualify as an established party or collect the necessary signatures and file another petition for recognition.[1] Ariz. Rev. Stat. §§ 16-801(B), 16-803, 16-804.

Potential candidates also must satisfy certain statutory conditions to access the ballot. For a new party candidate to qualify for placement on the party's primary ballot, the candidate must first file a statement of interest with the appropriate filing officer for the office to which the candidate seeks election. Ariz. Rev. Stat. §§ 16-311(A), (H). The statement of interest must contain the name of the potential candidate, the political party, and the name of the office sought. *Id.* § 16-311(H). Following the statement of

---

[1] To be an "established party" in Arizona, a party must retain party membership greater than 0.66% of registered voters in that jurisdiction or secure at least 5% of the total votes cast in the prior general election. *Ariz. Libertarian Party*, 925 F.3d at 1088 (citing Ariz. Rev. Stat. § 16-804). An established party, such as the Democratic, Republican, and Libertarian Parties, has the benefit of "continued representation" on the ballot. *Id.*

interest, the potential candidate may start collecting signatures on a nomination petition. *Id.* To qualify for placement on the primary ballot, the potential candidate must submit signatures exceeding 0.1% "of the total vote for the winning candidate or candidates for governor or presidential electors at the last general election within the district." Ariz. Rev. Stat. § 16-322(C). If a candidate does not qualify for placement on the primary ballot, or "[i]f no candidate is nominated in the primary election for a particular office," the candidate is prohibited from appearing on the general election ballot as a member of that party. Ariz. Rev. Stat. § 16-302.

Arizona holds "semi-closed" primary elections. It allows voters to express a party preference when they register to vote and, through this affiliation, they become eligible to vote and run as a candidate in the primary election as a member of that party. *See* Ariz. Rev. Stat. §§ 16-152(A)(5) (providing for registration of party preference); 16-467(B) (providing primary ballots "for a voter who is registered as a member of a political party"). Unaffiliated voters also may vote in a party primary of their choosing. *See* Ariz. Rev. Stat. § 16-544(D) (providing that a voter not registered as a member of a political party may "designate a political party ballot").

No Labels Party of Arizona ("No Labels," "the Party," and Appellee), a state-level affiliate of No Labels, Inc.,[2] qualified as a new party under Arizona law on March 7, 2023, for federal, statewide, and legislative races in the 2024

---

[2] No Labels, Inc. is a 501(c)(4) nonprofit organization headquartered in Washington, D.C. The organization "was established in 2009 to bridge the partisan divide in Washington by advancing commonsense reforms and convening officeholders from both major parties."

Primary and General Elections, after obtaining more than 30,000 valid signatures on petition sheets. *See* Ariz. Rev. Stat. § 16-322(C). The petition sheets distributed by No Labels included the following language:

> I, the undersigned, a qualified elector in the county of ____, state of Arizona, hereby petition that a new political party become eligible for recognition, and be represented by an official party ballot at the next ensuing regular primary election, to be held on the _____ and accorded a column on the official ballot at the succeeding general election to be held on the _____.[3]

More than six months after becoming a party, on August 11, 2023, No Labels accepted and adopted a constitution and bylaws. The bylaws assign No Labels, Inc. the sole right to appoint initial state committee members and officers. Proceeding under the bylaws, No Labels, Inc. appointed three state committee members, who ultimately adopted a rule to "ensure that only one candidate may be nominated for" the office of President and Vice President. The same day that No Labels adopted its constitution and bylaws, it informed the Secretary that the Party would not participate in Arizona's 2024 primary election.

At no time prior to the passing of the bylaws did No Labels inform the Arizona voters who signed the Party's petition that it did not intend to seek down-ballot positions. This became a problem as party membership grew and the

---

[3] The blank spaces on the petition sheet are to be filled in by the submitting party before circulation.

party attracted the interest of potential candidates.[4]   Indeed, five individuals filed statements of interest—two of which were filed prior to the passing of No Labels's bylaws—for placement on the primary ballot as No Labels's candidates for U.S. Congress, the Arizona legislature, and Arizona's Corporation Commissioner Office.

Shortly after passing its bylaws, No Labels wrote to the Secretary requesting him to "refuse to accept Statements of Interest or nominating petitions for [the interested candidates], and any other person who would seek to use No Labels' ballot line in contravention of No Labels' stated intentions and desire."   The Secretary refused to disregard the statements of interest, informing No Labels that he has a "nondiscretionary duty to accept candidate filings" that are properly filed by registered members of a political party in Arizona pursuant to Arizona Revised Statute section 16-311. Dissatisfied with the Secretary's response, No Labels brought this suit under 42 U.S.C. § 1983, alleging that the Secretary's application of Arizona law violates the Party's rights under the First and Fourteenth Amendments of the United States Constitution and seeking declaratory and injunctive relief.[5]   No Labels asked the district court to "preliminar[il]y and permanently enjoin [the] Secretary . . . from forcing No Labels Arizona to associate with and

---

[4] No Labels defines party membership more narrowly in its bylaws for purposes of serving in party leadership.  But it does not contest Arizona's use of "members" to refer to the registered voters affiliated with their party.  We have generally referred to such voters as party members, and do so here.  *See Ariz. Libertarian Party*, 925 F.3d at 1088.

[5] Before the district court, No Labels also alleged that the Secretary's response violates Arizona Revised Statute section 16-301(A), a state election law.  That claim is not at issue here because No Labels did not appeal that part of the judgment.

nominate a candidate for Corporation Commissioner and U.S. Senator or for any other office."

The district court consolidated the request for the preliminary (and permanent) injunction with the hearing on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). Following the merits hearing, the district court granted No Labels's request for declaratory and injunctive relief after concluding that its state law claim failed but that its First Amendment and Fourteenth Amendment claims prevailed. With respect to these claims, the district court viewed the burden on No Labels's rights as substantial and Arizona's interests as minimal.

As to the burden on No Labels, the district court reasoned that No Labels has a First Amendment right "to define the boundaries and structure of its association, including what offices it intends to seek." This right, the court explained, is burdened by Arizona's requirement that the eligible candidates be placed on the primary election ballot for offices No Labels does not plan to pursue. As for Arizona's interests, the district court concluded that Arizona's disagreement with No Labels's choices in structuring itself does not overcome the burden placed on No Labels's First Amendment rights, particularly because Arizona "does not have an interest in eliminating corruption in a primary election (or in a party's selection of its primary candidates) where the party is not running any candidates." The district court concluded that the party members and voters have no associational right in selecting a nominee for an office the party is not seeking. It also reasoned that, because the State did not submit evidentiary proof, Arizona did not have an interest in avoiding voter confusion. So weighing the burden on No Labels's rights against Arizona's interest, the district court concluded that Arizona's interest

did not outweigh the substantial burden on No Labels.[6]  The Secretary appealed.  We now reverse.

## STANDARD OF REVIEW

Because the district court consolidated its ruling on a preliminary injunction with its decision on the merits, we review the district court's conclusions of law de novo and its factual findings for clear error.  *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1031 (9th Cir. 2013).  We review the scope of the permanent injunction for abuse of discretion.  *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017).

To obtain a permanent injunction, a plaintiff must demonstrate: "(1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction." *Indep. Training & Apprenticeship Program*, 730 F.3d at 1032.

## DISCUSSION

Voting is, without a doubt, "of the most fundamental significance under our constitutional structure." *Burdick v.*

---

[6] We take judicial notice of the fact that No Labels members received blank ballots and thus did not vote in Arizona's 2024 primary election due to the permanent injunction forbidding the Secretary from "[a]ccepting as valid any Statements of Interest filed by persons expressing interest to run as No Labels Arizona candidates for any 2024 primary election."  Nicole Ludden & Hank Stephenson, *A blank ballot?*, Ariz. Agenda (May 7, 2024), https://arizonaagenda.substack.com/p/a-blank-ballot; *see* Fed. R. Evid. 201(b) (allowing a court to take judicial notice of a fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

*Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).  Only with the help of the states—which play a key role "in structuring and monitoring the election process, including primaries"—can democracy carry on.  *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000).  But with the state's intervention, there lies an "inevitable tension between a state's authority and need to regulate its elections and the First and Fourteenth Amendment rights of voters, candidates, and political parties."  *Ariz. Libertarian Party*, 925 F.3d at 1090.

Citizens of a state are free to associate with the party of their choice and to assert their preference for candidates by casting their ballots in the general election.  *Storer v. Brown*, 415 U.S. 724, 728 (1974).  This is a "primary concern," and a right that means little if a voter's preferred party is kept off the ballot and "thus denied an equal opportunity to win votes."  *Williams v. Rhodes*, 393 U.S. 23, 31 (1968); *see also Anderson v. Celebrezze*, 460 U.S. 780, 786, 806 (1983) (noting that voters' ability to choose to associate together and to express their support for a candidate is a "primary concern").  Indeed, "[a] prime objective of most voters in associating themselves with a particular party must surely be to gain a voice in that selection process," which includes participation in primary elections.  *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973).

Political parties likewise retain a First Amendment association right.  A party may "limit its membership as it wishes" and "choose a candidate-selection process that will in its view produce the nominee who best represents its political platform."  *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 202–03 (2008) (citing *Democratic*

*Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (1981), and *Jones*, 530 U.S. at 574–75).

These rights, however, have limits. *See Burdick*, 504 U.S. at 433 ("It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute."). When the state allows a political party to have a role in the election process, "the State acquires a legitimate governmental interest in ensuring the fairness of the party's nominating process, enabling it to prescribe what that process must be." *Lopez Torres*, 552 U.S. at 203. As the Supreme Court has made clear, there are many instances where a state's interest outweighs the party's right to have a say in the candidate-selection process. *See id.* For instance, a state may require a party to use either a primary or a convention to select its nominees for the general election. *See American Party of Tex. v. White*, 415 U.S. 767, 781 (1974). Most states also "prohibit multiple-party, or 'fusion,' candidacies for elected office," which is constitutional. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 353 (1997); *see id.* at 353 n.1 (explaining that fusion is "the electoral support of a single set of candidates by two or more parties"). Additionally, a state may have a disaffiliation provision, *Storer*, 415 U.S. at 736, which forbids a "person affiliated with a party at any time during the year leading up to the primary election . . . from appearing on the ballot as an independent or as the candidate of another party." *Timmons*, 520 U.S. at 369.

In considering a constitutional challenge to a state's electoral regulations, we must keep these interests in mind and strike a balance. To do this, we apply the *Anderson-Burdick* test, weighing "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"

against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

To determine the applicable level of scrutiny, we must consider "the severity of the burden the election law imposes on the plaintiff's rights." *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008). If the election regulation imposes a severe burden, it "is subject to strict scrutiny and will be upheld only if it is narrowly tailored to serve a compelling state interest." *Id.* at 1035. A regulation that imposes a lesser burden, however, will be upheld so long as it is justified by a state's important regulatory interests. *Burdick*, 504 U.S. at 434; *see also Clingman v. Beaver*, 544 U.S. 581, 592 (2005) ("[N]ot every electoral law that burdens associational rights is subject to strict scrutiny[;] . . . [i]nstead, . . . strict scrutiny is appropriate only if the burden is severe."); *Anderson*, 460 U.S. at 788 ("[A] state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.").

## I.

No Labels brings a narrow challenge. It does not argue that Arizona's neutral voter regulations, when even-handedly applied, are unconstitutional. Instead, No Labels contends that the Secretary's refusal to reject prospective No Labels candidates' statements of interest is a substantial burden on the Party's First Amendment associational rights because No Labels is "forc[ed]" to "compete for offices it does not want to seek," which infringes on its "associational rights to structure itself," to "choose a standard bearer who speaks for the Party, and [to] decide where to devote its

resources." The Secretary counters that this is really an issue of ballot access; that allowing No Labels to dictate eligible candidates' placement on the primary ballot restricts an individual's right to access the ballot. However the argument is framed, we have little difficulty concluding that the Secretary's action, which merely administered state law and allowed eligible No Labels party members placement on the primary ballot, imposes, at most, a minimal burden on No Labels.

The case that controls our decision is the one No Labels tries hardest to distance itself from: *Alaskan Independence Party v. Alaska* ("*AIP*"), 545 F.3d 1173 (9th Cir. 2008), *as amended* (Oct. 22, 2008). In *AIP*, we considered an Alaska law—similar to the challenged Arizona law—that required parties to participate in a mandatory primary instead of a party-nominating convention. *Id.* at 1175–76 (considering Alaska Rev. Stat. §§ 15.25.010, 15.25.030(a)).[7] Alaska political parties argued that Alaska's law violated their First Amendment right of free association because it "force[d] parties to associate with undesired *candidates* who appear on the primary ballot and seek their parties' nominations." *Id.* at 1175. Rather than picking their candidates through the primary process, these parties asserted that they had "the right to determine how their candidates to appear on Alaska election ballots are to be selected, and that the State of Alaska must allow a political party to select its candidates for the general election ballot in a manner acceptable to the political party." *Id.* at 1176.

---

[7] To be placed on the ballot in Alaska, the candidate must be a member of the party in which it seeks to become a candidate of, swear a declaration of candidacy with the State, and meet the State's qualifications for office. Alaska Rev. Stat. § 15.25.030(a).

At bottom, these political parties asserted that they should be able to "present primary voters with a limited set of pre-approved candidates, whereas [the state] law permits any registered affiliate of the party [who is eligible under state law] to run in the primary." *Id.* at 1179.  The burden on the parties' rights, as they framed it, boiled down to a "conflict between the party's wish to enforce greater top-down control and the state's mandate that rank-and-file party voters have the opportunity to consider and vote for any affiliated party member [eligible under state law] who seeks the nomination." *Id.*  In rejecting the parties' argument, we expressed skepticism that the Alaska law severely burdened the third parties' associational rights. *Id.*  We ultimately did not need to decide that question, however, because Alaska's regulation survived even strict scrutiny, as mandating participation in a primary was narrowly tailored to advance Alaska's compelling interests. *Id.* at 1180.

Just like the parties in *AIP*, No Labels attempts to assert top-down control by dictating who may be on its ballot.  But a party does not have "monolithic control over its own members and supporters." *Anderson*, 460 U.S. at 803.  In fact, we have long rejected the idea that political parties have the right to nominate "whomever they want, however they want." *Lightfoot v. Eu*, 964 F.2d 865, 871 (9th Cir. 1992).

The parties' right to nominate may be circumscribed by the state's mandate of a primary election, "a neutral mechanism" that ensures intraparty competition is settled in a democratic fashion. *AIP*, 545 F.3d at 1177; *see also Jones*, 530 U.S. at 572 (citing *Am. Party*, 415 U.S. at 781); *Clingman*, 544 U.S. at 599 (O'Connor, J., concurring) (noting that nearly every state requires political parties to select their candidates for office through a primary: a "crucial juncture" in the election process for determining a

party's nominee for public office (internal quotation marks omitted)). Such a requirement of selecting candidates "democratically by registered party voters . . . from a slate of all qualified, affiliated candidates who seek the nomination" is unlikely to impose a severe burden on a parties' associational rights. *AIP*, 545 F.3d at 1179–80. This is particularly true when parties, like No Labels and those in *AIP*, remain capable of speaking out about whether candidates adhere to the parties' values, endorsing the candidates they choose, and distancing themselves from undesired candidates. *Id.* at 1180 (citing *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)). All told, *AIP* ultimately guides our decision, leading us to conclude that allowing eligible No Labels members to participate in Arizona's primary election as voters and candidates does not impose a severe burden on the rights of No Labels.

For its part, No Labels relies on two distinguishable Supreme Court cases: *Tashjian v. Republican Party of Connecticut*, where the Court held that a party has a First Amendment right to define "the boundaries of its own association, and of the structure which best allows it to pursue its political goals," 479 U.S. 208, 224 (1986), and *Eu v. San Francisco County Democratic Central Committee*, where the Court reiterated that "a political party's 'determination . . . of the structure which best allows it to pursue its political goals, is protected by the Constitution,'" 489 U.S. at 229 (alteration in original) (quoting *Tashjian*, 479 U.S. at 224). But the laws challenged in *Tashjian* and *Eu* are quite different from the Secretary's enforcement of Arizona's ballot access requirements at issue here. And No Labels overstates the breadth of these holdings; neither case stands for the principle that No Labels can repudiate

Arizona's ballot access law for the mere reason that it conflicts with No Labels's desires.

In *Tashjian*, the Republican Party of the State of Connecticut challenged a Connecticut electoral regulation that allowed only registered party members to participate in a party's primary (otherwise known as a closed primary). 479 U.S. at 210–11.  The Republican Party of the State of Connecticut sought, contrary to the regulation, to include independent voter participation.  *Id.*  The Supreme Court determined that this regulation impermissibly burdened the party, as it placed boundaries on the party's right to freely associate, which "necessarily presupposes the freedom to identify the people who constitute the association."[8]  *Id.* at 214–15 (quoting *Democratic Party*, 450 U.S. at 122).  Here, however, Arizona does not restrict No Labels from associating with non-members.

In *Eu*, California passed several electoral regulations that placed restrictions on the organization and composition of parties' official governing bodies.  For example, the regulations "requir[ed] parties to establish official governing bodies at the county level, . . . specif[ied] who shall be the members of the parties' official governing bodies," and placed "limits on the term of office for [certain] committee chair[s]." 489 U.S. at 229–30.  Several political parties, their members, and other groups and individuals sued the State of California and its officials, alleging that the state's regulations violated their free speech and free association rights.  *Id.* at 219.  The Supreme Court found that these

---

[8] Because the *Tashjian* Court applied strict scrutiny with "little discussion of the magnitude of the burdens imposed" by the state law, we do not know whether the Court considered the burden on the parties' rights to be substantial.  *Clingman*, 544 U.S. at 591–92.

regulations substantially burdened the parties' associational rights because they prevented the parties from governing themselves with the structures they thought best. *Id.* at 230. In coming to this conclusion, the Supreme Court noted that the associated rights at stake were "much stronger" than those credited in *Tashjian*. *Id.* The Court emphasized that, under the state's regulations, each party was left with limited discretion "in how to organize itself, conduct its affairs, and select its leaders." *Id.*

Unlike this case, *Eu* involved state interference with parties' internal processes. *See San Francisco Cnty. Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 829 (9th Cir. 1987), *aff'd*, 489 U.S. at 233 (noting the difference between regulations addressing forces *outside* the party and those that intrude on *internal* party affairs). California's regulations were wholly related to the internal composition and organization of the parties' official governing body. They thus involved "particularly egregious intrusions" into the parties' self-governance. *Lightfoot*, 964 F.2d at 871.

To be sure, the Secretary's enforcement of Arizona's law allows No Labels members to participate in the Party's candidate selection process. But the Secretary is not preventing No Labels from engaging voters in a manner it desires, as was the case in *Tashjian*. *See* 479 U.S. at 214. Nor do the regulations prevent No Labels from organizing itself or choosing leaders as it deems appropriate, as was the issue in *Eu*. 489 U.S. at 216.

No Labels also relies upon *Libertarian Party of Illinois v. Scholz*, a Seventh Circuit ballot access case addressing an Illinois electoral regulation that required minor parties to list a full slate of candidates to be included on the ballot. 872 F.3d 518 (7th Cir. 2017). But this reliance is misplaced. In

*Scholz*, the Seventh Circuit found that Illinois's regulation severely burdened the First Amendment rights of the "minor parties, their members, and voters." *Id.* at 524. Specifically, the regulation required minor parties to "find and recruit candidates for races they want[ed] nothing to do with," such as for "obscure offices like county recorder or coroner." *Id.* These minor parties, definitionally, were parties that had not attained sufficient voter support in past elections, making the burden on them quite severe. *Id.* at 520, 524. And for the recruited candidates who actually wanted to win their races, the minor parties were further burdened because they were required to offer "funding and other resources necessary to operate a full-fledged campaign." *Id.* at 524. In the event that a party was unable to fill an entire slate, the burden fell on the candidates, who were thus unable to run "as the standard bearer" for their party. *Id.* In turn, voters were burdened by the inability to vote for their desired candidates as a natural result of this boxing out of minor parties. *Id.* at 523.

Although Arizona's requirement and Illinois's regulation share clear similarities—party leaders are forced to run candidates in "races they want nothing to do with"— No Labels misunderstands what made the burden in *Scholz* so severe. *Id.* at 524. As *Scholz* identified, the Illinois regulation burdened not only the minor political parties, but also their voters who were prevented from voting for their preferred candidates, and the candidates who were barred from running as members of the party with which they chose to affiliate. *Id.* Comparatively, here, neither the candidates nor the voters of No Labels are burdened by the Secretary's enforcement of Arizona law, only the party leadership of No Labels is burdened. That fact severely limits the relevance of the *Scholz* decision, which recognized that the

fundamental right to political association centers on the ability to form a political party and elect its members to office, and "necessarily includes the party's right to access the ballot" along with "its candidates' right to appear on the ballot under the party banner." *Id.* at 520–21.

In a further effort to paint the burden as analogously severe to that recognized in *Scholz*, No Labels contends that it would similarly be required to "allocate resources" to races it does not want to be a part of. But No Labels fails to explain what resources it would have to devote, if any, or why it would be required to allocate resources to campaigns that it wants nothing to do with. Instead, No Labels merely reiterates that it "believes" it must expend resources on the down-ballot candidates' campaigns. This burden is distinct from the certain burden faced by the political parties in *Scholz*, where, for a minor party to appear on the ballot at all, the party was forced to expend resources on recruiting candidates for every office on the ballot. Arizona law does not force No Labels to recruit candidates; it merely requires that interested and eligible candidates be able to run. And party leaders remain free to communicate to the rest of their party (and public) which of the candidates the party leadership supports and which it disavows. *See Eu*, 489 U.S. at 223.

No Labels argues that it will be required to stray from its objective to focus exclusively on the offices of President and Vice President. But this objective appears illusory. For instance, No Labels did not run any candidate whatsoever for the 2024 general election, despite gaining party recognition for that purpose. And, as discussed above, it is unclear how much of a burden it would be upon No Labels to make clear, in future elections, that it is only supportive of candidates running for President and Vice President.

Lastly, No Labels's reliance on *California Democratic Party v. Jones* likewise does not persuade us of its position. There, California required parties to participate in a blanket primary, a system in which all candidates are combined on a single ballot and are voted upon by voters affiliated with any party. *Jones*, 530 U.S. at 570, 577. The Supreme Court held that a blanket primary violates political parties' First Amendment rights because it "forces political parties to associate with—to have their nominees, and hence their positions, determined by—those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival." *Id.* at 577. In this case, by contrast, only No Labels party members may run for office under the No Labels banner. *See* Ariz. Rev. Stat. § 16-311(A) ("A candidate for partisan public office shall be continuously registered with the political party of which the person desires to be a candidate beginning no later than the date of the first petition signature on the candidate's petition through the date of the general election at which the person is a candidate.").

We thus find the Secretary's action here imposes, at most, a minimal burden on No Labels's associational rights. But even if we considered the burden on No Labels to be more than minimal, we find the Secretary's enforcement of Arizona's election law to be narrowly tailored to achieve the State's compelling interests, which we now turn to.

## II.

Arizona asserts three interests that it seeks to further by enforcing its candidate eligibility regulations: (1) ensuring voter and candidate participation in the democratic process; (2) avoiding voter confusion; and (3) limiting opportunities for fraud and corruption. We now consider the legitimacy

and importance of these asserted interests, keeping in mind that a state's interests are important in the primary context as well because primary and general elections together "operate as a 'single instrumentality for choice of officers.'" *Ariz. Libertarian Party*, 925 F.3d at 1093 (quoting *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1026 (9th Cir. 2016) (en banc)); *see also United States v. Classic*, 313 U.S. 299, 319 (1941) ("[T]he practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election . . . and may thus operate to deprive the voter of his constitutional right of choice."). We also consider whether, even if it imposes a severe burden, Arizona's election law is narrowly tailored to serve these interests. *Ariz. Libertarian Party*, 925 F.3d at 1090 (citing *Norman v. Reed*, 502 U.S. 279, 289 (1992)); *see also AIP*, 545 F.3d at 1180 (analyzing a state primary law under strict scrutiny in the alternative, even though it was unlikely that the law imposed a severe burden).

**a.**

Ensuring voter and candidate participation is undoubtedly a legitimate state interest. *See Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 733 (9th Cir. 2015). Voter participation encompasses the voter's ability to associate with a party of their choice, *Kusper*, 414 U.S. at 58, and to choose a candidate that best reflects their preferences, *Anderson*, 460 U.S. at 787. A voter's ability to choose their preferred candidate is inextricably intertwined with a candidate's eligibility requirements, and by extension, a candidate's participation. *See id.* at 786 ("The impact of candidate eligibility requirements on voters implicates basic

constitutional rights.").**[9]** It follows then that candidate exclusion burdens voters. *See id.* at 787–88. Here, because the injunction forbade the Secretary from "[a]ccepting as valid any Statements of Interest filed by persons expressing interest to run as No Labels Arizona candidates for any 2024 primary election," No Labels members on the active early voter list automatically received blank ballots for Arizona's 2024 primary election. The exclusion of prospective No Labels candidates from the ballot meant that No Labels members were left with no candidates to cast a vote for. *See* Ariz. Rev. Stat. § 16-302 ("If no candidate is nominated in the primary election for a particular office, then no candidate for that office for that party may appear on the general or special election ballot . . . .").

The right to associate and the right to vote are "among our most precious freedoms." *Williams*, 393 U.S. at 30–31; *see also Burdick*, 504 U.S. at 433. Therefore, we have no trouble concluding that Arizona's interest in ensuring voter and candidate participation is compelling. *Anderson*, 460 U.S. at 794 (noting that a voter's exercise of political association is "of particular importance"). Indeed, it is hard to conceive of a more severe burden on a party's members than for those voters to receive blank primary ballots even though there were candidates willing to run on the party's ticket. Arizona's acceptance of candidates for the No Labels ballot is not only narrowly tailored to advance this interest, but it is also the only way to provide No Labels candidates and party voters access to the primary election. *See Lightfoot*, 964 F.2d at 871.

---

[9] Such candidate selection necessarily includes the right to vote for minor parties, a right that is "heavily burdened if that vote may be cast only for" "two old, established parties." *Williams*, 393 U.S. at 31.

**b.**

We also find Arizona's interest in avoiding voter confusion to be a legitimate regulatory interest. There is no dispute that a state's interest in avoiding voter confusion is a legitimate—and sometimes compelling—interest. *See Storer*, 415 U.S. at 732 (affirming the validity of the state's interest in preventing voter confusion when conducting the *Anderson-Burdick* test); *see also Ariz. Libertarian Party*, 925 F.3d at 1093 (noting that preventing voter confusion is an important interest); *Lightfoot*, 964 F.2d at 871 (finding that a state has a compelling interest in minimizing voter confusion).

The Secretary asserts that No Labels voters will be confused because they will receive blank primary ballots and face removal from Arizona's active early voting list under Arizona Revised Statute section 16-544(H)(4).[10]  Under Section 16-544(H)(4), Arizona allows voters to be removed from the active early voting list after "[t]he voter fails to vote an early ballot in all elections for two consecutive election cycles," which includes "any regular primary" for a federal election. No Labels explicitly represented to Arizona voters that it would hold a 2024 primary. But recall that No Labels members on the active early voter list did not vote in Arizona's 2024 primary election because they automatically received blank ballots. And because there is no 2026 presidential general election to run No Labels candidates, and no down-ballot candidates to cast a vote for, No Labels members will inevitably receive a second blank ballot. As a result, No Labels members cannot vote in a second Arizona

---

[10] Voters on the active early voting list receive a ballot-by-mail for each election for which the voter is eligible.  Ariz. Rev. Stat. § 16-544(H).

primary election and may be removed from Arizona's active early voting list.

While No Labels asserts that Arizona's asserted interests are too speculative to constitute compelling interests, we do not always "require 'a particularized showing of the existence of voter confusion.'" *See Ariz. Libertarian Party*, 925 F.3d at 1094 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986)). A speculative concern of voter confusion is insufficient to justify that burden on a plaintiff's rights only where the burden is more than de minimis. *See Soltysik v. Padilla*, 910 F.3d 438, 448 (9th Cir. 2018) ("[A] state need not offer 'elaborate, empirical verification' that voter confusion in fact occurs, particularly where the burden a challenged regulation imposes on a plaintiff's associational rights is slight or minimal." (quoting *Timmons*, 520 U.S. at 364)). But, as we concluded above, the burden on No Labels here is minimal at best, so Arizona's interest in preventing voter confusion is sufficient to sustain the minimal burden on No Labels's rights.

Arizona's interest in avoiding voter confusion is legitimate, and the Secretary's action in accepting eligible candidates' statements of interest serves to avoid such confusion. This interest is also compelling because, as discussed above, it is extraordinarily confusing for a party's members to receive blank primary ballots even after the qualifying petition explained that the party would be represented on that ballot. Arizona's election law is narrowly tailored to advance the interest of avoiding voter confusion because it prevents a situation where blank ballots are sent to voters, at least where there are willing candidates. *See Storer*, 415 U.S. at 730 ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos,

is to accompany the democratic process[].'").  Thus, this interest and Arizona's election law's narrow tailoring to advance this interest likewise favors Arizona.

**c.**

Lastly, "[w]e have long recognized that a state's interest in eliminating the fraud and corruption that frequently accompanied party-run nominating conventions is compelling."  *AIP*, 545 F.3d at 1180; *see also Munro*, 479 U.S. at 195 (recognizing that states have a "'compelling' interest in maintaining the integrity of [their] political processes" (quoting *Storer*, 415 U.S. at 736)).  To maintain the integrity of the political process, states may adopt election codes to "remove party nominating decisions from the infamous 'smoke-filled rooms' and place them instead in the hands of a party's rank-and-file, thereby destroying 'the corrupt alliance between wealthy special interests and the political machine.'"  *AIP*, 545 F.3d at 1177 (quoting *Lightfoot*, 964 F.2d at 872).  One way to limit the opportunity for fraud and corruption is through a direct primary, which "prevent[s] party leadership from controlling nominating decisions, while promoting democratic decisionmaking." *Id.*

Although No Labels is not seeking to elect candidates for most positions at this time, we conclude that Arizona's interest in avoiding fraud and corruption is furthered by the Secretary's acceptance of all eligible candidates' statements of interest.  Allowing No Labels to reject eligible candidates' statements of interest would thwart Arizona's long-recognized threshold for ballot access, giving No Labels party leaders the final say in party nominating decisions.  As with the practices at issue in *AIP*, this would remove power from the hands of a party's rank-and-file and place it back

into proverbial "smoke-filled rooms," *see id.*, which our caselaw does not condone.[11]

Arizona need not tolerate the potential manipulation of its balloting processes—and its voters—by party leaders. Just as we have long recognized states' compelling interest in eliminating fraud and corruption in party-run nominating conventions, we have also "long recognized . . . that a democratic primary is narrowly tailored to advance these state interests." *Id.* at 1180. The Secretary's acceptance of all eligible candidates' statements of interest is narrowly tailored to advance these interests.

## III.

The Secretary's acceptance of all eligible statements of interest, thereby allowing No Labels members access to the primary ballot pursuant to Arizona's eligibility requirements, imposes at most a minimal burden on No Labels. Arizona has justified that burden easily, as its asserted interests here are compelling. And even if we were to find that Arizona law imposes a substantial burden on the Party's rights, the Secretary's mere acceptance of statements of interests by eligible No Labels party members—allowing them to participate in a democratic primary—is narrowly tailored to advance Arizona's interests. *Lightfoot*, 964 F.2d

---

[11] This concern is underscored by the fact that, prior to its inception, No Labels never communicated to its members that it had no intention of running candidates for down-ballot positions. On the contrary, No Labels explicitly represented to Arizona voters that it would hold a 2024 primary. Only after receiving enough support to qualify as a party under Arizona law did No Labels announce its desire to run candidates only for the presidential ticket. If No Labels had communicated its intentions during the recognition and ballot eligibility process, there is no telling whether the Party would have gathered the requisite signatures to be recognized as a new party in Arizona.

at 873 (noting that "no measure short of the direct primary [is] adequate" to further the state's goal of avoiding fraud and corruption).

Because No Labels has failed to demonstrate a likelihood of actual success on the merits, we find the district court abused its discretion in issuing an injunction. *See Confederated Tribes & Bands of Yakama Nation v. Yakima County*, 963 F.3d 982, 993 (9th Cir. 2020) (affirming district court's denial of permanent injunction because plaintiff had not shown actual success on the merits); *Indep. Training & Apprenticeship Program*, 730 F.3d at 1039 (same).

## CONCLUSION

Though states must proceed with caution when regulating a party's ability to run its organization, "the state is not powerless to act." *Lightfoot*, 964 F.2d at 873. Action is appropriate—and necessary—when a party attempts to undermine the voting rights of its own members. The right to vote belongs to the party members, not the party leadership, and that is where it will remain. We therefore REVERSE the district court's grant of a permanent injunction and vacate the injunction.